JUDGE HERB ROSS (Recalled)

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA

605 West 4th Avenue, Room 138, Anchorage, AK 99501-2253 —   (Website: www.akb.uscourts.gov)
Clerk's Office:  907-271-2655 (1-800-859-8059 In-State) — Judge's Fax:  907-271-2692

**Filed On
6/1/11**

| | |
|---|---|
| Case No. A10-00565-HAR | In Chapter 7 |
| In re THOMAS R. BEARUP and ADELE M. BEARUP, | MEMORANDUM DECISION FOR DISMISSAL UNDER § 707(b)(3)(B) |
| Debtor(s) | |

Index                                                                                                   Page

1. **SUMMARY OF DECISION**- . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   The Debtors' Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   FBFAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   Personal Residence and Church Property in Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   The Alaska Residence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   Thomas' Illness and Attempts to Find Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   Adele's Endeavors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   The Decline Precipitating Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   FBFAA's Responsibilities for the Bearups' Obligations and Its Debt to Thomas  . . . . . . . 5
   The Debtor's Current and Potential Income and Expenses  . . . . . . . . . . . . . . . . . . . . . . . . 6
   Debtors' and Counsel's Lack of Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3. **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.1.  Standards of Proof and Burdens of Producing Evidence in a § 707(b)(3)(B) Case . . . 8
   3.2.  Canons for Deciding a § 707(b)(3)(B) Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.3.  Post-BAPCPA Abuse Under Totality of the Circumstance . . . . . . . . . . . . . . . . . . . . . 9
   3.4.  Application of *In re Price* to This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

___

1. **SUMMARY OF DECISION**-  The United States Trustee (UST) filed a motion to dismiss for abuse under 11 USC § 707(b)(2) for failure to pass the Means Test or § 707(b)(3)(B) under the totality of circumstances.  The debtors, while having recently suffered financial reverses due

largely to health issues, have the right to tap cash flow from their nonprofit religious corporation and the ability to be gainfully employed (Adele[1]). Allowing them a chapter 7 discharge would be an abuse under § 707(b)(3)(B).

2. **BACKGROUND**-

**The Debtors' Background**- The debtors are pastors in a religious mission they have pursued for, probably, over 15 years. Adele testified she is a homemaker, but also testified she is a pastor, deeply committed to the Bearups' religious mission. Thomas is currently 64 and Adele is 52.

They both have Alaskan roots. Thomas was a law enforcement officer in Alaska and Adele lived there, too. They went to Arizona (the exact date is unclear) and both attended Arizona College of the Bible in 1993. They funded their education with student loans. The court recently denied the debtors' request to declare these student loan obligations, having a current balance of about $43,000 for Adele and $46,000 for Thomas, nondischargeable under 11 USC § 523(a)(8).[2]

**FBFAA**- After attending bible college, the debtors pursued their religious mission through a 501(c)(3) nonprofit corporation, Family Bible Fellowship and Academy (FBFAA), of which they are the controlling members.

**Personal Residence and Church Property in Arizona**- They owned a home in their own name in Phoenix. FBFAA owned a building in Phoenix where the Bearups operated a church.

In 2006, the Bearups sold their personal residence, receiving about $276,000 in cash. They bought a mobile home, trailers, and spent about a over a year traveling around the lower United States, deciding how next to continue their mission. They also paid their personal credit cards, and assisted family members financially. Their debts appear to have been current at that time,

---

[1] I will use the debtors' first names for ease of reference. No disrespect is intended by doing so.

[2] *See*, judgment in Adv. No. A10-90024-HAR, Bearup v Educational Credit Management Corp., Docket No. 48, entered May 16, 2011.

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

except for the student loan obligations, against which they paid nothing. They also used $40,000 to make a down payment on their current residence in Alaska. The $276,000 appears to have been fully spent at the time the bankruptcy was filed on July 1, 2010.

In September 2008, FBFAA sold the church for $725,000. The record is not clear what cash down was paid and what became of it, but FBFAA took back a $685,000 note and deed of trust on the church property. The note and deed of trust wrapped a first deed of trust with a balance of $175,000, so FBFAA's equity was $510,000.

The obligor on the FBFAA note has made the monthly payments regularly. They are made to an escrow which pays part of each monthly installment to the underlying, first deed of trust obligation, and the balance to FBFAA. The installment payments on the wraparound increased in April 2011, and now pay FBFAA a little over $3,000 per month. The parties did not advice the court about the current balance, but the court estimates that FBFAA's portion of the note probably exceeds $450,000.

**The Alaska Residence**- The debtors decided to relocate back to Alaska. They bought a home in their own names of about 4,000 square feet, a detached garage, and 31 acres in Soldotna, in about July 2007. On this property, they intended to live and continue the religious mission of FBFAA. The monthly payments on the property are $2,890 (including taxes)[3] Due to Thomas' illness and loss of income from Adele's child care enterprise (under the name, "The Ark"), mortgage payments were not made from December 2009. The Alaska loan servicer began foreclosure in about March 2010, triggering this bankruptcy case.

**Thomas' Illness and Attempts to Find Work**- After becoming ill in 2008, Thomas underwent abdominal surgery in Mexico in April 2009. There were life threatening complications and he had to undergo additional surgery in Alaska. He testified he was on the verge of death, but was saved when his stomach was removed.

---

[3] Amended Schedule J. Docket No. 55.

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

At his request, he was released for work by his physician in August 2010. He testified he sought the release so he could start earning an income again. His family was in dire financial straits due the illness and he wanted to work.

Since his medical release, he has tried finding work in the Soldotna area in law enforcement, real estate and a ministry, all without success. He attributes this to his age, his medical fragility and the stagnant economy.

**Adele's Endeavors**- When she returned to Alaska, Adele started a child care business in 2008, not to earn profit in the normal sense, but as an adjunct to the Bearups' ministry, which envisioned serving unwed mothers. The business was called "The Ark," but was accounted for under the FBFAA tax return. The Ark grossed $41,500 in 2009.[4]

The business was increasingly successful. The state welfare agency encouraged her to expand and take on more children to care for. She took the training required by the state to run a day care, and became certified. She eventually, employed two of her daughters to assist.

The business, despite its good start, started losing clients in the last half of 2009, through no fault of hers she testified, but due to some adverse market dynamics. The state still encouraged her to continue in the business, and she tried to do this, going to extraordinary measures to advertise and promote the child care facility. Nonetheless, she closed it in April 2010, after determining that continuing was hopeless.

She also made a small amount catering weddings.

Her testimony indicates to the court that she is a dynamic, energetic, forceful, innovative person, who has devoted her life to her church for 14 years for no personal salary and no employment benefits (such as health care). She is nonetheless capable of earning a decent salary at any reasonable endeavor she chooses, and seems to be the type of person who would rise to the top of almost any business she chose to pursue.

---

[4] FBFAA's Form 990 federal tax return. Trial Exhibit 4, page 36 of 48.

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

**The Decline Precipitating Bankruptcy**- The Bearups testified that they have not been able to pay their Alaska mortgage since December 2009. They said they started paying Loan Improvement Service, some type of Arizona loan consolidation service. They were told the service would help consolidate their student loan debt, their credit card debt, get a short sale of their mobile home, and a refinance of their Alaska deed of trust. They testified they made payments from the end of 2009. The amount is not clear to the court but it may be about $15,000. Adele said that Consumer Credit of Alaska had previously suggested the Bearups consider bankruptcy, but this was rejected by the debtors, because they wanted to pay their bills.

The debtors suggest that this was an indication of their good faith. While their good faith was not being challenged under § 707(b)(3)(A), this testimony was, nonetheless, not fully fleshed out. The testimony seems to raise more questions than it answers. Didn't their 2011 credit card statements show that no payments were being made? Since the student lenders had been so nonaggressive in their collection efforts since 1993, why seek third party help instead of going to the student lenders directly? Why go to an Arizona loan consolidator to deal with an Alaska real estate lender? Unfortunately neither the parties nor the court sought clarification.

Their motive for eventually filing bankruptcy on July 1, 2010 was to clear their credit (i.e., discharge about $250,000 of unsecured debt) so they could obtain refinancing or reduction of their mortgage debt on their Alaska real estate. Although the property is titled to them in their individual names, it is considered by the debtors to be a keystone to continuing their ministry.

In this bankruptcy case, they are trying to exclude the FBFAA income from their bankruptcy estate.

**FBFAA's Responsibilities for the Bearups' Obligations and Its Debt to Thomas**- During his ministry under FBFAA, Thomas was entitled to an parsonage allowance and salary from FBFAA. He never drew the salary, but has an account receivable from FBFAA of about $650,000. This was not reported as an asset on Thomas' bankruptcy schedules, although it was disclosed in

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

the process of the UST's investigation. This is not an insignificant omission, since FBFAA has assets – it is the beneficiary of the promissory note with a balance of over $450,000 from the sale of its Arizona property.

FBFAA also resolved to pay the Bearups' student loans, which it never did.

And, FBFAA was to pay the Bearups' advances for church activities. Much of the $158,000 credit card and store credit debt shown on the Bearups' Schedule B[5] is attributable to improvements on the Alaska property for church purposes (e.g., improving the child care facility in the garage).

FBFAA paid the monthly mortgage on the Alaska property, when it was paid.

The Bearups testified that they viewed their ministry as a 24/7 commitment, and contend that virtually all their endeavors, income and expenses were related to the church. To illustrate this, they testified that they only occupied as personal space one bedroom and one bathroom in their 4,000 square foot house. While it is unnecessary to determine what imponderable percentage of their time or assets is devoted to the church exclusively, I do not accept their shifting all their assets and income to the church to the extent this impairs their bankruptcy creditors' legitimate rights to their assets and income.

**The Debtor's Current and Potential Income and Expenses**- Thomas gets $1,084.00 per month from Social Security. In their schedules, the Bearups initially listed this as their only income. They eventually amended, due to the UST's persistence, to include a $2,031 monthly payment they had been receiving on a mobile home they had sold (which was a wash because of a similar payment obligation to a lien holder), and $217.50 per month each for the Alaska Permanent Fund dividend. This amended current income totaled $3,550.00. Their current

---

[5]Docket No. 1-3.

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

expenditures on amended Schedule J are listed at $4,574.00.  Thus, they claim to be underwater to the tune of $1,024.00 per month.[6]

Their expenditures include $2,890.00 for their home mortgage (including taxes).  The local IRS Housing and Utility Standard (mortgage/rental expense) amount which is allowable on Line 20B(a) in the means test calculation is $952 for the Kenai Peninsula Borough.[7]

Thomas is 64 years old.  His health has been compromised.  Thus, his prospects for finding work outside of his preference of being a pastor are not encouraging, despite his expertise in law enforcement and real estate.  Adele's prospects are, on the other hand, bright.  She is only 52, smart and proactive.  She may prefer to remain as a unpaid servant of her ministry, but should she chose to work elsewhere, she would prosper.

**Debtors' and Counsel's Lack of Cooperation**- There has been a lack of cooperation with the UST by the debtors and their counsel which is a factor in this decision.  Once it was apparent that the UST thought FBFAA's income was attributable to the Bearups, the UST should have been provided with *all* the available financial information he sought.

The UST had asked for financial information breaking down the accounting analysis in individual enterprises (the church, The Ark, and the Ambassador Wedding Chapel), it should have been provided.  Although much paperwork was produced, it was not until the trial on May 9, 2011, that the debtors acknowledged they had Quicken Books and/or separate accountings for each of the nonprofit segments.

A key element of the UST's case was that the church income was freely used to pay the debtors' personal expenses, and the church income should have thus been acknowledged to some

---

[6] Original Schedules I and J are at Docket No. 1-3.  The amended schedules are at Docket No. 55 on February 11, 2011.

[7] Trial Exhibit 1, page 4 of 8.  *See, also*, http://www.justice.gov/ust/eo/bapcpa/20100315/bci_data/housing_charts/irs_housing_charts_AK.htm as viewed on May 31, 2011.

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

degree as belonging to them individually for bankruptcy purposes. This failure of cooperation or disclosure is an element in the court's finding against the debtors in this case.

3. <u>ANALYSIS</u>-

3.1. **<u>Standards of Proof and Burdens of Producing Evidence in a § 707(b)(3)(B) Case</u>**- The UST bears the burden of showing abuse under the totality of the circumstances standard by a preponderance of the evidence. "Once a prima facie case is established by the UST, the burden of going forward with sufficient evidence to controvert the prima facie case is reposed in the non-moving party, the Debtor."[8]

3.2. **<u>Canons for Deciding a § 707(b)(3)(B) Case</u>**- The statutory framework governing dismissal for abuse under the totality of the circumstances is 11 USC § 707(b)(1, 3):

> (b)
>
>> (1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.
>
>> . . . .
>
>> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider-
>
>>> (A) whether the debtor filed the petition in bad faith; or
>
>>> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

---

[8] <u>In re Perelman</u>, 419 BR 168, 177-78 (Bankr. EDNY 2009) (citations omitted). The procedure for handling a motion to dismiss for abuse under § 707(b)(1) is set out in 6 *Collier on Bankruptcy* ¶ 707.04[5] (Matthew Bender on-line 2011).

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

Where the presumption of abuse does not arise under the means test, § 707(b)(2), a bankruptcy court is directed to ("shall") determine if grounds for dismissal for abuse exist under § 707(b)(3)(B).[9] For example, the case of a below-median-income debtor can be dismissed under the totality of the circumstances where the debtor obtained a good post-petition job and could have funded a chapter 13 plan paying his unsecured creditors about 20% of their claims.[10]

3.3. **Post-BAPCPA Abuse Under Totality of the Circumstance**- Before BAPCPA, the Ninth Circuit relied on a test under the prior law for "substantial abuse" set out in In re Price.[11] BAPCPA changed changed dismissal for "substantial abuse" to just dismissal for "abuse," a more relaxed standard. After BAPCPA, there is not presumption *favoring* a chapter 7 discharge.[12] Nonetheless, In re Price continues as a guide for cases in the Ninth Circuit in interpreting a "totality of the circumstances" abuse issue.[13]

Here are the six non-exclusive Price factors for finding "substantial" abuse under the totality of the circumstances are:

(1) Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;

(2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;

(3) Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;

(4) Whether the debtor's proposed family budget is excessive or extravagant;

---

[9] In re McUne, 357 BR 397, 399 (Bankr. D. Or. 2006).

[10] In re Pak, 343 BR 239, 244-46 (Bankr. N.D. Cal. 2006). *See, also,* In re Boyce, 446 BR 447, 452-53 (D. Or. 2011).

[11] In re Price, 353 F3d 1135, 1139-40 (9th Cir. 2004).

[12] In re Egebjerg, 574 F3d 1045, 1048 (9th Cir. 2009).

[13] In re Stubblefield, 430 BR 639, 645-46 (Bankr. D. Or. 2010).

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

(5) Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and

(6) Whether the debtor has engaged in eve-of-bankruptcy purchases.[14]

3.4. **Application of *In re Price* to This Case**- The second Price factor (illness as the cause of filing) favors the debtors, but the first (ability to fund a chapter 13 plan) and fifth (misrepresentations in debtors' statement of income and expsense) favor a finding of abuse.

UST has proved a *prima facie* case under § 707(b)(3)(B) for abuse under the totality of the circumstances. The debtors have not come forward with sufficient evidence to overcome the *prima facie* case.[15] If their Quicken Books and accounting records which were not fully or adequately disclosed to the UST contained information which would have saved their discharge, they did not present it to the court.

A "totality of the circumstances" test implies a balancing. I acknowledge the severe drain on the debtors' earning capacity due to Thomas' illness, not only because it impaired his ability to work, but it required Adele to act as his caregiver. But, he was released for work in August 2010.

On the other hand, in Adele's testimony to establish the sincerity of her effort to make a success of her child care and wedding catering business, she also established that she has the ability to work at a non-church job to make a good living and pay some or all of her unsecured debt in a chapter 13 plan. She testified she has worked 24/7 for the church, does not have health insurance, and will continue to do so regardless of how I rule. The question is whether she is entitled to a chapter 7 discharge if she chooses to give her labor to the church when she could use it to fund a chapter 13 plan. I do not believe she is entitled to a chapter 7 discharge if she does.[16]

---

[14] In re Price, 353 F3d 1135, 1139-40 (9th Cir. 2004).

[15] *See*, discussion in section 3.1 of this memorandum.

[16] In re Pak, 343 BR 239, 241-44 (Bankr. N.D. Cal. 2006).

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

This issue is similar to a student loan case in which the minister-debtor was not able to discharge a student loan because he was capable of earning substantially more at another job for which he was qualified, than a minster.[17]  The legal issues are not exactly the same because different statutes are involved, but the underlying principles are the same.  You are not entitled to a bankruptcy discharge if you chose to be "underemployed," either in a totality of the circumstances abuse situation or in a student loan context.

With respect to both debtors:  (a) Thomas has an unpaid account of $650,000 due from FBFAA for past wages; (b) FBFAA assumed the obligation to pay Thomas' $46,000 and Adele's $43,000 student loans to ECMC; (c) FBFAA has agreed to pay the expenses incurred by the church (over $150,000 of unsecured credit cards debt and store accounts are, in large part, due to church activities); and, (d) FBFAA is payee of a $450,000-$500,000 equity in a note currently paying over $3,000 per month to FBFAA (the note is current).  This scenario presents a *prima facie* case under § 707(b)(3)(B) for abuse.  There are funds owed to the debtors by FBFAA.  There is a note capable of paying much of debtors' unsecured debt.  Debtors have tried to keep those funds out of the bankruptcy estate, but the estate is entitled to them.  They are probably enough to pay the creditors 100%, over time.

Debtors have argued that the promissory note due to FBFAA is secured by Phoenix property which is worth much less than the value of the note because of the poor Arizona real estate market.  They attempted to offer incompetent testimony for this proposition, which was not allowed.  For now, the note is being paid.  But, even if the note is eventually dishonored, it is the basis for a chapter 13 plan, which could have been modified in the event circumstances changed.

Between the FBFAA note and Adele's potential income, there would be enough to fund a chapter 13 plan.  None has been proposed.  I conclude that there is abuse under § 707(b)(3)(B).

---

[17] Oyler v Educational Credit Mgt. Corp. (In re Oyler), 397 F3d 382, 386 (6th Cir. 2005).

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)

Finally, the court also concludes the fifth element of Price, misrepresentation of income and expenses, favor granting the trustee's motion under § 707(b)(3)(B).

4. **CONCLUSION**- This memorandum addresses only abuse under § 707(b)(3)(B). In the interest of deciding the dispute as soon as possible, I adopted the Occam's Razor approach of seeking the simplest solution. If reversed, however, I will revisit the substantial case presented by the UST for dismissal for abuse for failure to pass the Means Test under § 707(b)(2).

Finally, nothing in this memorandum is intended to denigrate the Bearups or their religious mission. I cannot say that I ever thought that they volitionally lied on the stand. I do believe, however, that their personal narrative or memory of the past, like most of people in conflict, is colored. As a homely example, they had no problem deferring for almost two decades repayment of their student loans when they had the opportunity to pay them down.

I believe they are basically sincere, decent people caught in a tough financial place. In the end, this memorandum holds that when there is a clash between debtors desire to continue their mission versus their duty to pay their creditors, if they can, they must forfeit their right to a chapter 7 discharge if they chose their mission over the creditors.

A separate order of dismissal of the case will be entered.

DATED: June 1, 2011

                                             /s/ Herb Ross
                                            HERB ROSS
                                          U.S. Bankruptcy Judge

Serve:
Kay Hill, Assistant US Trustee
Jennifer Sodaro, Esq., for the debtors
Diane Vallentine, Esq., for ECMC
Case Manager
Jan Ostrovsky, Clerk                                                                                           D7485
            6/1/11

MEMORANDUM DECISION FOR
DISMISSAL UNDER § 707(b)(3)(B)